# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 17-5236**                                              **September Term, 2017**
                                                              **1:17-cv-02122-TSC**
                                                              **Filed On: October 20, 2017**

Rochelle Garza, as guardian ad litem to
unaccompanied minor J.D., on behalf of
herself and others similarly situated,

        Appellee

    v.

Eric D. Hargan, Acting Secretary, Health and
Human Services, et al.,

        Appellants

## O R D E R

    It is **ORDERED**, on the court's own motion, that the Clerk issue the attached statement of Circuit Judge Millett, dissenting from the disposition of this case.

                                                      **FOR THE COURT:**
                                                      Mark J. Langer, Clerk

                                BY:    /s/
                                                    Amy Yacisin
                                                   Deputy Clerk

MILLET, *Circuit Judge*, dissenting from the disposition of the case.

There are no winners in cases like these. But there sure are losers. As of today, J.D. has already been forced by the government to continue an unwanted pregnancy for almost four weeks, and now, as a result of this order, must continue to carry that pregnancy for multiple more weeks. Forcing her to continue an unwanted pregnancy just in the hopes of finding a sponsor that has not been found in the past six weeks sacrifices J.D.'s constitutional liberty, autonomy, and personal dignity for no justifiable governmental reason. The flat barrier that the government has interposed to her knowing and informed decision to end the pregnancy defies controlling Supreme Court precedent.

To escape terrible physical abuse in her family, a seventeen-year-old girl known here as J.D. fled her home country and all she has ever known, and all alone undertook a life-imperiling trek for hundreds, perhaps thousands, of miles seeking safety. Unaccompanied minor migrants are among the most vulnerable persons in the world. J.D.'s journey exposed her to a tragically high risk of physical abuse, rape, and sexual exploitation at the hands of other migrants, smugglers, and governmental officials in every country whose territory she crossed.[1]

After entering the United States, she was detained by federal immigration officials and, at that time, learned that she is pregnant. Alone, resourceless, and facing a perilous future, J.D. was appointed a guardian *ad litem* and, in compliance with Texas law, obtained a state court order determining that she was (and is) mature enough to decide for herself whether to continue the pregnancy. J.D. has also gone through the mandatory counseling required by Texas law and has reconfirmed her decision. Indeed, the United States does not dispute that J.D. is mature enough to determine her own best interests, nor has it identified any reason that it is not in her best interests to exercise the choice she made, other than a federal agency's own opposition to abortion. The federal government further represents that it would trust her judgment, if only she had chosen to continue the pregnancy. But J.D. chose not to continue her pregnancy.

The United States has for weeks now refused to release J.D. into the custody of her guardian *ad litem* to obtain the abortion. It is undisputed that J.D.'s guardian and attorneys—not the federal government—will transport her and bear the costs of

---

[1] *See generally* UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, WOMEN ON THE RUN (2015), http://www.unhcr.org/5630f24c6.html; UNICEF, HUMAN TRAFFICKING FOR SEXUAL EXPLOITATION PURPOSES IN GUATEMALA (2016), http://www.cicig.org/uploads/documents/2016/Trata_Ing_978_9929_40_829_6.pdf.

the abortion procedure. The logistics and paperwork of transferring her to the custody of her guardian *ad litem* will all be handled by a government contractor that is fully willing to do so. TRO Hr'g Tr. at 4:3–5. It will not be done directly by any federal governmental official. And J.D.'s post-procedure medical care will be administered by the contractor, not by government officials themselves. The Department of Health and Human Services' only task is to *refrain* from barring its contractor from allowing J.D. to receive the medical care.

The government does not dispute—in fact, it has knowingly and deliberately chosen not to challenge—J.D.'s constitutional right to an abortion. The government instead says that it can have its contractor keep J.D. in what the government calls "close" custody—that is, more restrictive conditions than the contractor imposes on the non-pregnant minors in its care—because of the agency's own supervening judgment that it would be in J.D.'s best interests to carry the pregnancy to term. If she wants an abortion, the government continues, she must surrender all legal claims to remain in the United States and return to the country of her abuse.

That is wrong and that is unconstitutional.

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which was reaffirmed just last year in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016), should decide this case. In *Casey*, the Court held that a "woman's right to terminate her pregnancy before viability" is "a rule of law and a component of liberty we cannot renounce." 505 U.S. at 871. "[I]t follows that it is a constitutional liberty of the woman to have some freedom to terminate her pregnancy" at the pre-viability stage. *Id.* at 869. That liberty is necessary, the Court added, to protect "the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," and "central to the liberty protected" by the Due Process Clause. *Id.* at 851. The Constitution's guarantee of due process thus protects that right for "any person," U.S. CONST. Amend. V, against undue governmental interference. While the government can have its own interest in promoting the continuation of pregnancy and potential life, prior to viability the government may not place a "substantial obstacle" in the way of a woman's right to decide for herself to discontinue a pregnancy. *Whole Woman's Health*, 136 S. Ct. at 2309. Setting up substantial barriers to the woman's choice violates the Constitution. That is settled, binding Supreme Court precedent.

What is forcing J.D. to carry on this pregnancy is not J.D.'s choice. It is not Texas law. It is the federal government's refusal to allow an abortion to go forward.

3

The government's refusal to release J.D. from custody is not just a substantial obstacle; it is a full-on, unqualified denial of and flat prohibition on J.D.'s right to make her own reproductive choice.

What reason does the federal government offer for taking over J.D.'s decision completely and forcing her to continue an unwanted pregnancy that Texas law permits her to terminate? None that remotely qualifies under the Constitution, or that even makes sense.

*First*, the government says it does not want to "facilitate" the abortion. But there is nothing for it to facilitate. As noted, J.D. will be transported to the medical procedure by her guardian *ad litem*. Any expense will be fully born by her guardian and attorneys. All paperwork and medical care will be done by a government contractor. And, as government counsel conceded at oral argument, the court order under review made it unnecessary for the Department of Health and Human Services to decide for itself whether the procedure is in J.D.'s best interests from a federal government perspective.

For those reasons, the government's reliance on cases recognizing the government's ability to prefer that pregnancies be taken to term, to provide information about its views, and to require informed consent through processes that do not unduly burden the woman's choice are of no help. *See, e.g., Harris v. McRae*, 448 U.S. 297 (1980). The government identifies no case that says the government has a right to flatly prohibit an abortion—to override the woman's choice—by virtue of keeping her in custody. And to be clear, it is a custody from which the government would willingly release her to attend doctor appointments if she were to continue her pregnancy. (No risk of flight or danger to the community has even been whispered in this case.) So what the government really claims here is not a right to avoid subsidizing the abortion decision; it claims a right to use *immigration* custody to nullify J.D.'s constitutional right to reproductive autonomy prior to viability.

*Second*, custody does not empower the government to completely override a woman's informed and volitional decision to have an abortion. *See Roe v. Crawford*, 514 F.3d 789 (8th Cir. 2008) (striking as unconstitutional a prohibition on abortion for prisoners with exceptions only for express approval and where necessary for the health of the mother); *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987) (striking as unconstitutional a policy requiring prisoners to obtain a court ordered release on their own recognizance in order to receive an abortion).

What is more, the government's insistence that it must not even stand back and permit an abortion to go forward for someone in some form of custody is freakishly erratic. The government admits that, if J.D. were an adult, she would be held in the custody of Immigration and Customs Enforcement (ICE). That means that the government permits women just a few months older than J.D. who are in ICE custody to obtain an abortion.[2] Likewise, it facilitates the process so that women in the custody of the Bureau of Prisons can obtain abortions. 28 C.F.R. § 551.23.

So why is J.D.'s case any different? The government says that, because she is a minor, an official in the Department of Health and Human Services must independently agree that an abortion is in J.D.'s best interests. And this Administration refuses to so agree. Without any explanation other than its opposition to abortion. In so doing, the federal government distrusts the State of Texas, which has conducted a hearing pursuant to state law and authorized J.D. to make the decision herself and to decide whether continuing or terminating the pregnancy is in her own best interest in this respect. J.D. may make that decision without the consent of her "parent, managing conservator or guardian." Texas Family Code § 33.003(i-3). Notwithstanding the States' constitutional primacy in matters of domestic relations, *e.g., Mansell v. Mansell*, 490 U.S. 581, 587 (1989), the United States argues that a federal government official in Washington, D.C. is better positioned and has more authority under the Constitution to prevent an abortion than not only the State, but also *the woman and any parent or husband or father of the child*. At least, until the woman turns 18. No judicial bypass exists for that federal official's decision. That is an astonishing power grab, and it flies in the teeth of decades of Supreme Court precedent preserving and protecting the fundamental right of a woman to make an informed choice whether to continue a pregnancy at this early stage.

*Third*, the government says that J.D. is free to get an abortion as long as she agrees to voluntarily depart the United States. But the government cannot condition the exercise of a constitutional right by women and girls on their surrender of other legal rights. The fact that J.D. entered the United States without proper documentation does *not* mean that she has no legal right to stay here to be safe from abuse or persecution. The Statue of Liberty's promise to those "homeless" "yearning to breathe free" is not a lie.

---

[2] ICE Guidelines, Detention Standard 4.4, Medical Care, available at https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf.

5

Federal law, for example, expressly permits juvenile immigrants to seek "special immigrant juvenile status" by showing that they are (i) under 21 years of age, (ii) unmarried, and (iii) dependent juveniles "as a result of abuse, abandonment, or neglect." *Yeoboah v. United States Dep't of Justice*, 345 F.3d 216, 221-222 (3d Cir. 2003); *see* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.

Needless to say, conditioning a woman's exercise of her fundamental right to reproductive choice, *see Casey, supra*, on the surrender of other legal rights is at the least a substantial obstacle to the exercise of her constitutional right. And by the way, this is a Hobson's Choice that the federal government demands only of female immigrants.

The majority here accepts none of those arguments by the government. Instead, the court orders J.D. to continue her pregnancy for weeks. Not because she has failed to follow required State processes. She has met every requirement. And not because the majority agrees that the federal government can exercise an unbypassable veto over the reproductive decision of a minor in its custody. The only reason given is an interest in further pursuing the availability of finding a sponsor for J.D.

That too is forbidden by Supreme Court precedent. The desire to find a sponsor for J.D. to release her from detention is understandable. Children are presumably better off with family members or responsible adults than in the custody of a government contractor. But finding a sponsor and allowing her to terminate the pregnancy are not mutually exclusive. Both can proceed simultaneously. So the desire to pursue that process has nothing to do with and is not a reason for forcing J.D. to continue the pregnancy.

Perhaps the majority wants another adult to be involved in J.D.'s reproductive decision. But J.D. has already made that choice with a guardian *ad litem* by her side, and after all the consent processes demanded by Texas law. To force her to continue the pregnancy just in case someone else comes along with whom J.D. might also consult is to impose layers and layers of consent-style barriers to J.D.'s choice, contrary to settled Supreme Court precedent. *See Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 75 (1976); *Bellotti v. Baird*, 443 U.S. 622, 640–642 (1972) (striking statute requiring minor to obtain the consent of both parents prior to an abortion as unduly burdensome). Even a parent or husband does not have the power that federal government officials now claim to wield. *See id*.

6

By the way, that distrust of whether J.D. has made an informed-enough-for-the-federal-government decision is a one-way street. It applies only to the decision to end the pregnancy. Had she chosen to continue the pregnancy, that judgment would have been fully respected and supported by the federal government without any further proceedings. If J.D. is mature enough to decide to continue the pregnancy, then she is mature enough to decide not to continue it as well (as Texas law agrees).

Nor is there any factual basis to think that remand will accomplish anything but a forced continuation of the pregnancy. After at least six weeks of trying, no sponsor has been found. Two were identified, but neither passed muster under Health and Human Services' review. (We are not told why, and counsel for the government could not say whether the sponsors' willingness to support J.D.'s abortion decision played a role in those decisions.) And even if a sponsor suddenly appears, that sponsor cannot override J.D.'s choice given that the judicial bypass order makes the consent of a guardian or custodian unnecessary.

This sponsorship process, moreover, is entirely in the control of the Department of Health and Human Services. J.D. cannot control the timing of the decision, nor is there any apparent procedure for challenging a decision or a delayed non-decision. Nor is there any reason to think that a sponsor can be found in short order. If the federal government knew of a sponsor, it would have come forward with that already. The government does not maintain an active list of potential sponsors, and even if one were identified, there is an understandably rigorous vetting process before a child will be handed into the custody of a third party, which includes (i) interviewing prospective sponsors; (ii) sponsors' completion of extensive paperwork; (iii) a thorough background check, fingerprint check, immigration Central Index System check; (iv) home visits where necessary; and (v) conducting an assessment of the child's relationships to non-related prospective sponsors.[3] The federal government could not tell the court how long that process would take, even assuming a responsible sponsor would suddenly be found.

And in this context, timing profoundly matters. Every day that goes by is another day that the federal government forces J.D. to carry an unwanted pregnancy forward. Days also increase the health risks associated with an abortion procedure. *See*, *e.g.*, *Williams v. Zbaraz*, 442 U.S. 1309, 1314–1315 (1979) (Stevens, J., sitting as Circuit

---

[3] https://www.acf.hhs.gov/orr/about/ucs/sponsors.

7

Justice) (evidence of an increased risk of "maternal morbidity and mortality" supports a claim of irreparable injury); Linda A. Bartlett, *et al.*, *Risk Factors for Legal Induced Abortion—Related Mortality in the United States*, 103:4 OBSTETRICS & GYNECOLOGY 729 (April 2004) (relative risk from abortion increases 38% each gestational week). In addition, if J.D. is 17 or 18 weeks along by the time this issue is resolved, the doctors at the South Texas clinic nearest to her (assuming it still has availability) will likely no longer be willing to perform the procedure. That will force J.D. to travel hundreds of miles to the next closest medical provider in North Texas. She will be forced to endure this journey twice, once to repeat a counseling session she has already received and again for the procedure itself.

The sponsorship remand, in short, stands as an immovable barrier to J.D.'s exercise of her constitutional right that inflicts irreparable injury without any justification offered for why the government can force her to continue the pregnancy until near the cusp of viability.

Lastly, the amici suggest that J.D. and all others in the United States without documentation are not "persons" entitled to the protections of the Due Process Clause. The United States government, understandably, has deliberately and knowingly decided *not* to raise that argument. It is both forfeited and waived. *See Wood v. Milyard*, 132 S. Ct. 1826, 1832 n.4 (2012); *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004).

Basic principles of constitutional avoidance and circuit precedent direct us not to decide far-reaching constitutional questions that the parties have deliberately and knowingly chosen not to raise. Indeed, we have held that "[t]he grounds for recognizing the forfeiture of arguments are especially strong where the alleged error is constitutional." *Board of County Comm'rs v. Federal Housing Fin. Agency*, 754 F.3d 1025, 1031 (D.C. Cir. 2014) (holding that the need for constitutional avoidance is particularly acute where a party's forfeiture makes deciding the constitutional question neither "necessary nor even advisable"); *see Camreta v. Greene*, 563 U.S. 692, 705 (2011) (A "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (internal quotation marks and citations omitted); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–347 (1936) (Brandeis, J., concurring); *Colm v. Vance*, 567 F.2d 1125, 1132 n.11 (D.C. Cir. 1977) (concluding that constitutional "avoidance is especially preferred where the nature of the constitutional issue poses a difficult decision with significant ramifications").

There are few constitutional questions more far-reaching than the proposition that individuals in the United States without legal documentation do not even qualify

8

as "persons" under the Constitution. The Supreme Court has long recognized that immigrants who lack lawful status are protected persons under the Due Process Clause. *See*, *e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (even aliens whose "presence in this country is unlawful, involuntary, or transitory [are] entitled to th[e] constitutional protection" of Fifth and Fourteenth Amendment due process); *Jean v. Nelson*, 472 U.S. 846, 875 (1985) (regardless of immigration status, aliens within the territorial jurisdiction of the United States are "persons" entitled to due process under the Constitution); *cf. Plyler v. Doe*, 457 U.S. 202, 210 (1982) (children of persons here unlawfully are protected "persons" under the Equal Protection Clause of the Fourteenth Amendment).

The implications of amici's argument that J.D. is not a "person" in the eyes of our Constitution is also deeply troubling. If true, then that would mean she and everyone else here without lawful documentation—including everyone under supervision pending immigration proceedings and all Dreamers—have no constitutional right to bodily integrity in any form (absent criminal conviction). They could be forced to have abortions. They could, if raped by government officials who hold them in detention, then be forced to carry any pregnancies to term. Even if pregnancy would kill the Mother, the Constitution would turn a blind eye. Detainees would have no right to any medical treatment or protection from abuse by other detainees. Those with diabetes or suffering heart attacks could be left to die while their governmental custodian watches.

Fortunately, we need not confront that profoundly unsettling argument because no party has raised or briefed it and, as noted, the government has expressly disavowed advancing it. In an emergency proceeding of this nature, we should be particularly hesitant to decide sweeping questions of constitutional law unnecessarily and without any briefing.

\* \* \* \* \*

J.D. came to the United States without legal documentation. That is not disputed. But the government cannot make a forced pregnancy the sanction for that action. J.D. retains her basic rights to personhood. After all, this child fled here all alone in a desperate effort to avoid severe abuse. And, unfortunately, other women and girls desperate to escape abuse, sexual trafficking, and forced prostitution undoubtedly will also find themselves on our shores and pregnant. When they,

9

consistent with legal process, decide to continue their pregnancies, that decision should be supported. When they decide that their dire circumstances leave them in no position to carry a pregnancy to term, the Constitution forbids the government from directly or effectively prohibiting their exercise of that right in the manner it has done here.

I accordingly dissent.