# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

───────

FILED ON: OCTOBER 24, 2017

No. 17-5236

ROCHELLE GARZA, AS GUARDIAN AD LITEM TO
UNACCOMPANIED MINOR J.D., ON BEHALF OF HERSELF AND
OTHERS SIMILARLY SITUATED,
APPELLEE

v.

ERIC D. HARGAN, ACTING SECRETARY, HEALTH AND HUMAN
SERVICES, ET AL.,
APPELLANTS

───────

On Petition for Rehearing En Banc

───────

Before: Garland, *Chief Judge*; Henderson***, Rogers, Tatel,
Griffith***, Kavanaugh***, Srinivasan, Millett**, Pillard*, and
Wilkins, *Circuit Judges*

# O R D E R

Upon consideration of appellee's petition for rehearing en
banc and the supplements thereto, the response to the petition
and the supplement to the response, the corrected brief for amici
curiae States of New York, California, Connecticut, Delaware,
Hawaiʻi, Illinois, Iowa, Maine, Massachusetts, Oregon,
Pennsylvania, Vermont, and Washington, and the District of
Columbia in support of appellee's petition, and the vote in favor
of the petition by a majority of the judges eligible to participate;

2

and appellee's motion to recall the mandate and petition for en banc consideration of appellee's motion to recall the mandate, it is

**ORDERED** that the mandate be recalled. The Clerk of the district court is directed to return forthwith the mandate issued October 20, 2017. It is

**FURTHER ORDERED** that appellee's petition for rehearing en banc be granted. This case has been considered by the court sitting en banc without oral argument, no judge having requested oral argument. It is

**FURTHER ORDERED** that the order filed October 20, 2017 be vacated, except that the administrative stay remains dissolved. It is

**FURTHER ORDERED** that appellants' emergency motion for stay pending appeal be denied because appellants have not met the stringent requirements for a stay pending appeal, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), substantially for the reasons set forth in the October 20, 2017 dissenting statement of Circuit Judge Millett.[1] The case is hereby remanded to the district court for further proceedings to amend the effective dates in paragraph 1 of its injunction. The dates in paragraph 1 have now passed, and the parties have proffered new evidence and factual assertions concerning the expected duration of custody and other matters. The district court is best suited to promptly determine in the first instance the appropriate dates for compliance with the injunction. In so doing, the district court retains full discretion to conduct proceedings and make any factual findings deemed necessary and appropriate to the district court's exercise of its equitable judgment, consistent with this order, including with regard to any of the factual disputes that were raised for the first time on appeal. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330-31 (2006); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 305 (D.C. Cir. 2006).

3

The Clerk is directed to issue the mandate forthwith.

**<u>Per Curiam</u>**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:      /s/
Ken Meadows
Deputy Clerk

\*   Circuit Judge Pillard did not participate in this matter.

\*\* A statement by Circuit Judge Millett, concurring in the disposition of the case, is attached to this order.

\*\*\* A statement by Circuit Judge Henderson, dissenting from the disposition of the case, is attached to this order.

\*\*\* A statement by Circuit Judge Kavanaugh, joined by Circuit Judges Henderson and Griffith, dissenting from the disposition of the case, is attached to this order.

_____

[1] As both parties agree, the court has jurisdiction over this appeal because the district court's temporary restraining order was more akin to preliminary injunctive relief and is therefore appealable under 28 U.S.C. § 1292(a)(1). *See Sampson v. Murray*, 415 U.S. 61, 86 n.58 (1974).

MILLETT, *Circuit Judge*, concurring:

While I disagreed with the panel order, I recognize that my colleagues labored hard under extremely pressured conditions to craft a disposition that comported with their considered view of the law's demands.

Fortunately, today's decision rights a grave constitutional wrong by the government. Remember, we are talking about a child here. A child who is alone in a foreign land. A child who, after her arrival here in a search for safety and after the government took her into custody, learned that she is pregnant. J.D. then made a considered decision, presumably in light of her dire circumstances, to terminate that pregnancy. Her capacity to make the decision about what is in her best interests by herself was approved by a Texas court consistent with state law. She did everything that Texas law requires to obtain an abortion. That has been undisputed in this case.

What has also been expressly and deliberately uncontested by the government throughout this litigation is that the Due Process Clause of the Fifth Amendment fully protects J.D.'s right to decide whether to continue or terminate her pregnancy. The government—to its credit—has never argued or even suggested that J.D.'s status as an unaccompanied minor who entered the United States without documentation reduces or eliminates her constitutional right to an abortion in compliance with state law requirements.

Where the government bulldozed over constitutional lines was its position that—accepting J.D.'s constitutional right and accepting her full compliance with Texas law—J.D., an unaccompanied child, *has the burden of extracting herself from custody* if she wants to exercise the right to an abortion that the government does not dispute she has. The government has insisted that it may categorically blockade exercise of her constitutional right unless this child (like some kind of legal Houdini) figures her own way out of detention by either (i)

2

surrendering any legal right she has to stay in the United States and returning to the abuse from which she fled, or (ii) finding a sponsor—effectively, a foster parent—willing to take custody of her and to not interfere in any practical way with her abortion decision.

That is constitutionally untenable, as the en banc court agrees. Settled precedent from *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), to *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), establishes that the government may not put substantial and unjustified obstacles in the way of a woman's exercise of her right to an abortion pre-viability. The government, however, has identified no constitutionally sufficient justification for asserting a veto right over J.D. and Texas law.

Judge Kavanaugh's dissenting opinion claims that the court has somehow broken new constitutional ground by authorizing "immediate abortion on demand" by "unlawful immigrant minors" (Judge Kavanaugh's Dissent Op. 1). What new law? It cannot be J.D.'s status as an undocumented immigrant because the government has accepted that her status does not affect her constitutional right to an abortion, as Judge Kavanaugh's opinion acknowledges on the next page (Dissent Op. 2). Accordingly, in this litigation, J.D., like other minors in the United States who satisfy state-approved procedures, is entitled under binding Supreme Court precedent to choose to terminate her pregnancy. *See, e.g.*, *Bellotti v. Baird*, 443 U.S. 622 (1979). The court's opinion gives effect to that concession; it does not create a "radical" "new right" (Judge Kavanaugh Dissent Op. 1) by doing so.[1]

---

[1] Because at no point in its briefing or oral argument in this court or the district court did the government dispute that J.D. has a constitutional right to obtain an abortion, the government has forfeited any argument to the contrary. *See*, *e.g.*, *Koszola v. FDIC*,

3

Beyond that, it is unclear why undocumented status should change everything. Surely the mere act of entry into the United States without documentation does not mean that an immigrant's body is no longer her or his own. Nor can the sanction for unlawful entry be forcing a child to have a baby. The bedrock protections of the Fifth Amendment's Due Process Clause cannot be that shallow.

Abortion on demand? Hardly. Here is what this case holds: a pregnant minor who (i) has an unquestioned constitutional right to choose a pre-viability abortion, and (ii) has satisfied every requirement of state law to obtain an abortion, need not wait additional weeks just because she—in the government's inimitably ironic phrasing—"refuses to leave" its custody, Appellants' Opp'n to Reh'g Pet. 11. That sure does not sound like "on demand" to me. Unless Judge Kavanaugh's dissenting opinion means the demands of the Constitution and Texas law. With that I would agree.

### 1. Sponsorship

The centerpiece of the panel order (and now Judge Kavanaugh's dissenting opinion at 2-3) was the conclusion that forcing J.D. to continue her pregnancy for multiple more weeks is not an "undue burden" as long as the sponsorship search is undertaken "expeditiously." Panel Order at 1. The panel order then treated its ordered eleven-day delay as just such an expeditious process.

But that starts the clock long after the horses have left the gate. The sponsorship search has already been underway for

---

393 F.3d 1294, 1299 n.1 (D.C. Cir. 2005). In fact, at oral argument, government counsel affirmed, in response to a direct question, that the argument was waived in this case. Oral Arg. 17:50; *see, e.g.*, *GSS Group Ltd. v. National Port Auth. of Liberia*, 822 F.3d 598, 608 (D.C. Cir. 2016).

4

now-almost *seven weeks*. Throughout all of that time, the government was under a statutory obligation to find a sponsor if one was available. *See* 8 U.S.C. § 1232(c)(2). None materialized. Tacking on another eleven days to an already nearly seven-week sponsorship hunt—that is, enforcing an almost *nine week* delay before J.D. can even start again the process of trying to exercise her right—is the antithesis of expedition. A nine-week waiting period before litigation can start or resume, if adopted by a State, would plainly be unconstitutional. *Cf. Whole Woman's Health*, 136 S. Ct. at 2318 (striking restrictions on abortion providers as unduly burdensome, noting in part "clinics' experiences since the admitting-privileges requirement went into effect of 3-week wait times") (citations omitted).

For very good reason, the sponsorship process is anything but expeditious. The sponsor is much like a foster parent, someone who chooses to house and provide for a child throughout her time in the United States, and who promises to ensure her appearance at all immigration proceedings. To protect these acutely vulnerable children from trafficking, sexual exploitation, abuse, and neglect, Congress requires the Department of Health and Human Services to be careful in its review and restrictive in who can apply. *See* 8 U.S.C. § 1232. To that end, agency regulations provide that potential sponsors must either be related to J.D. or have some "bona fide social relationship" with the child that "existed before" her arrival in the United States.[2]

---

[2] Office of Refugee Resettlement, Section 2: Safe and Timely Release from ORR Care, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited Oct. 24, 2017) ("In the absence of sufficient evidence of a *bona fide social relationship* with the child and/or the child's family that existed *before* the child

5

On top of that, the panel's order did not say that, at the end of its eleven days, J.D. could terminate her pregnancy if no sponsor were found. Quite the opposite: The order just stopped everything—except, critically, the continuation of J.D.'s pregnancy—until October 31st, at which time J.D. would have to restart the litigation all over again unless a sponsor was lucked upon. There is nothing expeditious about the prolonged and complete barrier to J.D.'s exercise of her right to terminate her pregnancy that the panel order allowed the government to perpetuate.

Nor was any constitutionally sound justification for the order's imposition of eleven more days on top of the already elapsed seven weeks ever advanced by the government. In fact, the government (i) never requested a stay to find a sponsor; (ii) never asked for a remand; (iii) never suggested in briefing or oral argument that there was any prospect of finding a sponsor at all, let alone finding one in the next eleven days or even in the foreseeable future; (iv) never even hinted, since no family member has been approved as a sponsor, that a non-family member could be identified, vetted, and take custody of J.D. within eleven days; and (v) never made any factual or legal argument contending that the already-seven-week-long-and-counting sponsorship process was an "expeditious" process or the type of short-term burden that could plausibly pass muster under Supreme Court precedent to bar an abortion.

All the government argues with respect to sponsorship was that its flat and categorical prohibition of J.D.'s abortion was permissible because she could leave government custody if a sponsor were found or she surrendered any claim of legal right to stay here and voluntarily departed. Oral Arg. 12:35; 24:30–

---

migrated to the United States, the child will *not* be released to that individual.") (emphases added).

6

25:15.  Custody, the government insists, is the unaccompanied child's problem to solve.

A detained, unaccompanied minor, however, has precious little control over the sponsorship process.  The Department of Health and Human Services is statutorily charged with finding, vetting, and approving sponsors.  *See* 8 U.S.C. § 1232(c); 6 U.S.C. § 279.  So the government's position that J.D. cannot exercise her constitutional right unless the government approves a sponsor imposes a flat prohibition on her reproductive freedom that J.D. has no independent ability to overcome.

Nor does sponsorship bear any logical relationship to J.D.'s decision to terminate the pregnancy.  Because J.D. has obtained a judicial bypass order from a Texas court that allows her to decide for herself whether an abortion is in her own best interests, a sponsor would have no ability to control or influence J.D.'s decision.  *See* Texas Family Code § 33.003(i-3).  Accordingly, finding a sponsor and allowing J.D. to exercise her unchallenged constitutional right are not mutually exclusive.  The two can and should proceed simultaneously.

Judge Kavanaugh's dissenting opinion (at 4) suggests that it would be good to put J.D. "in a better place when deciding whether to have an abortion."  That, however, is not any argument the government ever advanced.  The only value of sponsorship identified by the government was that sponsorship, like voluntary departure from the United States, would get J.D. and her pregnancy out of the government's hands.

In any event, even if sponsorship, as Judge Kavanaugh supposes, might be more optimal in a policy sense, J.D. has already made her decision, and neither the government nor the dissenting opinion identifies a constitutionally sufficient justification consistent with Supreme Court precedent for

7

requiring J.D. to wait for what may or may not be a better environment. The dissenting opinion further assumes that J.D. is different because she lacks a "support network of friends and family." Judge Kavanaugh's Dissent Op. 5. Unfortunately, the central reason for the bypass process is that pregnant girls and women too often find themselves in dysfunctional and sometimes dangerous situations—such as with sexually or physically abusive parents and spouses—in which those networks have broken down. *See* Texas Family Code § 33.003(i-3) (authorizing bypass when the court finds that "the notification and attempt to obtain consent would not be in the best interest of the minor[]"). It thus would require a troubling and dramatic rewriting of Supreme Court precedent to make the sufficiency of someone's "network" an added factor in delaying the exercise of reproductive choice even after compliance with all state-mandated procedures.

"Voluntary" departure is not a constitutionally adequate choice either given both the life-threatening abuse that J.D. claims to face upon return, and her potential claims of legal entitlement to remain in the United States. *See* Sealed Decl.; 8 U.S.C. § 1101(a)(27)(J) (special immigrant juvenile status); 8 C.F.R. § 204.11.[3] Notably, while presenting a legal argument

---

[3]    While the government now objects that J.D. has not previously identified on which statutory basis she would seek relief from removal, Appellants' Opp'n to Reh'g Pet. 5–6, 14, J.D. has argued all along that her exercise of her unchallenged right under the Due Process Clause to an abortion could not be conditioned on her "giv[ing] up her opportunity to be reunited with family here in the United States, or forcing her to return to her home country and abuse." Appellee's Opp'n to Appellants' Mot. for a Stay Pending Appeal 18; *see* Pl.'s Reply in Supp. of Mot. for TRO 6 ("The government should not be allowed to use her constitutional right to access abortion as a bargaining chip to trade for immigration status[.]"). While she had not yet cited to particular statutory

8

that relied heavily on voluntary departure to defend its abortion prohibition, government counsel was unable to confirm at oral argument whether or how voluntary departure actually works for unaccompanied minors over whom the government is exercising custody. *See* Oral Arg. 28:15–28:50; *cf*. 6 U.S.C. § 279(b)(2)(B) (restricting the release of unaccompanied minors on their own recognizance). The government has put nothing in the record to suggest that it is in the practice of putting children on airplanes all alone and just shipping them back to abusive and potentially life-endangering situations.

### 2. Facilitation

The government argues that it need not "facilitate" J.D.'s decision to terminate her pregnancy. But the government is engaged in verbal alchemy. To "facilitate" something means "[t]o make (an action, process, *etc*.) easy or easier; to promote, help forward; to assist in bringing about (a particular end or result)."[4] This case does not ask the government to make things easier for J.D. The government need not pay for J.D.'s abortion; she has that covered (with the assistance of her guardian *ad litem*). The government need not transport her at any stage of the process; J.D. and her guardian *ad litem* have arranged for that. Government officials themselves do not even have to do any paperwork or undertake any other administrative measures. The contractor detaining J.D. has advised that it is willing to handle any necessary logistics, just as it would for medical appointments if J.D. were to continue her pregnancy. The government also admitted at oral argument

---

provisions, that presumably is because the government has not yet initiated removal proceedings.

[4] *See* OXFORD ENGLISH DICTIONARY ONLINE ("facilitate" def. 1(a)), http://www.oed.com/view/Entry/67460?redirectedFrom= facilitate#eid (last visited Oct. 24, 2017).

9

that, in light of the district court's order, the Department of Health and Human Services does not even need to complete its own self-created internal "best interests" form. *See* Oral Arg. 31:40–33:15. So on the record of this case, the government does not have to facilitate—make easier—J.D.'s termination of her pregnancy. It just has to not interfere or make things *harder*.

The government's suggestion of sponsorship as a facilitation-free panacea also overlooks that it would require substantial governmental effort and resources for J.D. to be placed into the hands of a sponsor who must enter into an agreement with the government and is responsible for ensuring the minor's appearance at all immigration proceedings.[5] While after expending all of its resources to find, vet and approve the transfer, the government's ongoing ties to sponsors are presumably less than for a grantee, the government has put no facts in the record or any argument as to why that difference in degree should be constitutionally sufficient. In any event, transferring J.D. into the custody of the guardian *ad litem* to obtain the abortion would require far *less* use of governmental resources and personnel and far less facilitation. The government's desire to have as little to do as possible with J.D.'s exercise of her constitutional right while in custody thus seems erratic.

The government's claim that it does not think that an abortion is in J.D.'s best interests does not work either. The judicial bypass already put that best interests decision in J.D.'s hands. On top of that, the government does not even claim that it is making an individualized "best interests" judgment in

---

[5] *See* Office of Refugee Resettlement, Section 2.8.1: After Care Planning, available at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2 (last visited Oct. 24, 2017).

10

forbidding J.D.'s abortion.  It is simply supplanting her legally authorized best interests judgment with its own categorical position against abortion—which is something not even a parent or spouse or State could do.  Only the big federal government gets this veto, we are told.

The government unquestionably is fully entitled to have its own view preferring the continuation of pregnancy, and to even require the disclosure of information expressing that view.  But the government's mere opposition to J.D.'s decision is not an individualized "best interests" judgment within any legally recognized meaning of that term, and its asserted categorical bar to abortion is without constitutional precedent.

### 3.   *Abuse of Discretion Review*

In resolving this case, it must be remembered that this case arises on abuse-of-discretion review of a district court's injunctive order.  *See*, *e.g.*, *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  And the expedition with which the panel and now the en banc court have acted underscores that time is a zero-sum matter in this case.  J.D. is already into the second trimester of her pregnancy, which means that, as days slip by, the danger that the delayed abortion procedure poses to her health increases materially.  We are told that waiting even another week could increase the risk to J.D.'s health, the potential complexity of the procedure, and the great difficulty of locating an abortion provider in Texas.[6]  The sealed declaration filed in this case attests that a

---

[6]   Oral Arg. 1:13:45-1:15:10 (Counsel for J.D.:  "Texas law requires counseling at least 24 hours in advance of the procedure by the same doctor who is to provide the abortion.  Because of the limited availability of doctors to provide abortions in Texas, the same doctor is not always at the facility in south Texas. So, for example, the doctor that provided the counseling yesterday to J.D. is there

11

compelled return to her country at this time would expose her
to even more life-threatening physical abuse.

The irreparable injury to J.D. of postponing termination of
her pregnancy—the weekly magnification of the risks to her
health and the ever-increasing practical barriers to obtaining an
abortion in Texas—have never been factually contested by the
government. J.D.'s counsel has advised, and the government
has not disputed, that she is on the cusp of having to travel

---

today and on Saturday, but is not the same doctor who is there next
week. So next week, there is a different doctor there on Monday and
Tuesday, so if J.D. were allowed to have the abortion next week, she
would have to be, unless this court declares otherwise, * * *
counseled by this different doctor there on Monday and wait 24 hours
to have the abortion on Tuesday. * * * [After Tuesday October 24,
2017], we are looking at the following week. The doctor that is there
Thursday, Friday and Saturday, the following week * * * [is the
doctor that only performs abortions at 15.6 weeks]. And we are very
concerned that she is on the cusp, so even if she is able to go next
week, she may be past the limit for that particular doctor."); Reh'g
Pet. 4–5; Appellee's Opp'n to Appellants' Mot. for a Stay Pending
Appeal 3; *see Williams v. Zbaraz*, 442 U.S. 1309, 1314–1315 (1979)
(Stevens, J., sitting as Circuit Justice) (evidence of an increased risk
of "maternal morbidity and mortality" supports a claim of irreparable
injury); Linda A. Bartlett, *et al.*, *Risk Factors for Legal Induced
Abortion—Related Mortality in the United States*, 103:4 OBSTETRICS
& GYNECOLOGY 729 (April 2004) (relative risk from abortion
increases 38% each gestational week); Cates, W. Jr, Schulz, K.F.,
Grimes, D.A., Tyler, C.W. Jr., *The Effect of Delay and Method
Choice on the Risk of Abortion Morbidity*, FAMILY PLANNING
PERSPECTIVES 1977; 9:266, 273 ("[I]f a woman delays beyond the
eighth week up to 10 weeks, the major morbidity rate is 0.36, which
is 57 percent higher than her risk at eight or fewer weeks. Similarly,
if she delays her abortion procedure until the 11-12-week interval,
she increases her relative risk of major morbidity by 91 percent.").

12

hundreds of miles to obtain an abortion. *See* Appellee's Opp'n to Appellants' Mot. for a Stay Pending Appeal 9 (representing that, as of October 19, 2017, depending on which doctor is available, it may be that J.D.'s "only option next week would be to travel hundreds of miles to a more remote clinic"); Reh'g Pet. 5; *supra* note 6. Likewise, at no time before the district court or the panel did the government's briefing or oral argument dispute J.D.'s claim of severe child abuse or ask for fact finding on that claim.

On the other side of the balance, the government asserts only its opposition to an abortion by J.D. as an unaccompanied minor in the custody of a Department of Health and Human Services grantee. That is an acutely selective form of resistance since the government acknowledges it would not apply were J.D. to turn 18 and be moved to Immigration and Customs Enforcement custody or were she a convicted criminal in Bureau of Prisons custody. Oral Arg. 9:20–11:45. Under current governmental policy and regulations, those women are permitted to terminate their pregnancies.[7] Given that dissonance in the government's position, the balancing of interests weighs heavily in J.D.'s favor.

In short, I fully agree with the en banc court's decision to deny the government's motion for a stay and to remand for further expeditious proceedings and any appropriate fact finding, especially in light of the factual disputes surfaced for the first time in the rehearing papers.

Because J.D.'s right to an abortion under the Due Process Clause is unchallenged and because J.D. has done everything that Texas law requires (and more) to obtain an abortion, the government bore the burden of coming forward with a

---

[7] *See* ICE Guidelines, Detention Standard 4.4, Medical Care, available at https://www.ice.gov/doclib/detention-standards/2011/medical_care_women.pdf; 28 C.F.R. § 551.23.

13

constitutionally sufficient justification for flatly forbidding termination of her pregnancy. The government's mere hope that an unaccompanied, abused child would make the problem go away for it by either (i) surrendering all of her legal rights and leaving the United States, or (ii) finding a sponsor the government itself could never find is not a remotely constitutionally sufficient reason for depriving J.D. of any control over this most intimate and life-altering decision. The court today correctly recognizes that J.D.'s unchallenged right under the Due Process Clause affords this 17-year-old a modicum of the dignity, sense of self-worth, and control over her own destiny that life seems to have so far denied her.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting:
Does an alien minor who attempts to enter the United States
eight weeks pregnant—and who is immediately apprehended
and then in custody for 36 days between arriving and filing a
federal suit—have a constitutional right to an elective abortion?
The government has inexplicably and wrongheadedly failed to
take a position on that antecedent question.    I say
wrongheadedly because at least to me the answer is plainly—
and easily—no.  To conclude otherwise rewards lawlessness
and erases the fundamental difference between citizenship and
illegal presence in our country.

The en banc Court endorses or at least has no problem with
this result.  By virtue of my colleagues' decision, a pregnant
alien minor who attempts to enter the United States illegally is
entitled to an abortion, assuming she complies with state
abortion restrictions once she is here.  Under my colleagues'
decision, the minor need not have "developed substantial
connections with this country," *United States v. Verdugo-
Urquidez*, 494 U.S. 259, 271 (1990), as the plaintiff here
plainly has not.  Under my colleagues' decision, the minor need
not have "effected an entry into the United States," *Zadvydas
v. Davis*, 533 U.S. 678, 693 (2001), because the plaintiff here
did not, *see id*. (alien "paroled into the United States pending
admissibility," without having "gained [a] foothold," has "not
effected an entry").    Under my colleagues' decision, it is
difficult to imagine an alien minor anywhere in the world who
will not have a constitutional right to an abortion in this
country.  Their action is at odds with Supreme Court precedent.
It plows new and potentially dangerous ground.  Accordingly,
I dissent from the vacatur of the stay pending appeal.

## I.  BACKGROUND

In or about early July 2017, 17-year-old Jane Doe (J.D.)
became pregnant.  On or about September 7, 2017, she
attempted  to  enter  the  United  States  illegally  and

2

unaccompanied.  By J.D.'s own admission, authorities detained
her "upon arrival."  District Court Docket Entry (Dkt. No.) 1-
13 at 1.  She has since remained in federal custody—in a
federally funded shelter—because she is an "unaccompanied
alien child."  6 U.S.C. § 279(g)(2) ("unaccompanied alien
child" is "a child who," *inter alia*, "has no lawful immigration
status in the United States" and "has not attained 18 years of
age").

The Office of Refugee Resettlement (ORR) of the United
States Department of Health and Human Services (HHS) is
responsible for "unaccompanied alien children who are in
Federal custody by reason of their immigration status."  6
U.S.C § 279(b)(1)(A).  In March 2008, HHS announced a
"[p]olicy" that "[s]erious medical services, including . . .
abortions, . . . require heightened ORR involvement."  HHS,
*Medical Services Requiring Heightened ORR Involvement*
(Mar. 21, 2008), perma.cc/LDN8-JNL5.  In March 2017,
consistent with that policy, ORR further announced that shelter
personnel "are prohibited from taking any action that facilitates
an abortion without direction and approval from the Director
of ORR."  Dkt. No. 3-5 at 2.

According to the declaration of an ORR official, J.D. was
physically examined while in custody and "was informed that
she [is] pregnant." Dkt. No. 10-1 at 2. J.D.'s counsel interprets
the declaration to say that "J.D. did not learn that she was
pregnant until after her arrival in the United States."  Pl.'s Opp.
to Defs.' Emergency Mot. for Stay Pending Appeal (Opp.) 22-
23; *see also* Panel Dissent of Millett, J. (Panel Dissent) 2
("After entering the United States, [J.D.] . . . learned that she is
pregnant.").  But the declaration does not rule out that J.D.
knew she was pregnant even before the examination.  Nor has
J.D. herself alleged that she first learned of her pregnancy in
this country.  *See generally* Dkt. No. 1-13 at 1 (J.D.'s

3

declaration in support of complaint). And it is highly likely she knew when she attempted to enter the United States that she was pregnant, as she was at least eight weeks pregnant at the time.[1] Notably, elective abortion is illegal in J.D.'s home country. Oral Arg. Recording 29:19-29:34.

J.D. requested an abortion. The evidence before us is that it is an elective abortion: nothing indicates it is necessary to preserve J.D.'s health.[2] J.D.'s request was relayed to the ORR Director, who denied it. On October 13, 2017—having spent a mere 36 days in the United States, all of them in custody—J.D. filed suit in district court, enlisting this country's courts to vindicate (*inter alia*) her alleged Fifth Amendment right to an abortion. The next day, she applied for a temporary restraining order (TRO) and moved for a preliminary injunction.

The government opposed J.D.'s application and motion. For reasons known only to the government, it did not take a position on whether J.D.—as an alien who attempted to enter the United States illegally and who has no substantial connections with this country—has any constitutional right to an abortion. Instead the government argued that ORR has placed no "undue burden" on the alleged right. Dkt. No. 10 at 11-16 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)). At the TRO hearing, the district court repeatedly pressed the government about whether J.D. has a constitutional right to an abortion. The government emphasized that it was

_____

[1] A recent declaration filed under seal by J.D.'s attorney ad litem provides further circumstantial evidence that J.D. left her home country because of her pregnancy. Cortez Decl. ¶ 8.

[2] At oral argument, HHS stated its policy is that an emergency abortion, which it interprets to include a "medically necessary" abortion, would be allowed. Oral Arg. Recording 20:00-20:27.

4

"not taking a . . . position" but was "not going to give [the court] a concession" either.  Opp., Supplement 14.

The district court issued a TRO requiring that the government allow J.D. to be transported to an abortion provider for performance of the procedure.  The government appealed the TRO to this Court and sought a stay pending appeal.  At oral argument, the government repeatedly stated that it takes no position on whether J.D. has a constitutional right to an abortion, Oral Arg. Recording 8:10-8:46, 16:43-17:12, and that it instead "assume[s] for the purposes of . . . argument" that she has such a right, Oral Arg. Recording 17:27-17:52.[3]

On October 20, 2017, over a dissent, a motions panel of this Court issued an order directing the district court to allow HHS until close of business October 31 to find a suitable sponsor to take custody of J.D. so that HHS can release her from its custody.  Without deciding whether J.D. has a constitutional right to an abortion, the panel concluded that a short delay to secure a sponsor does not unduly burden any alleged right if the process is expeditiously completed by close of business October 31.

---

[3]  Under insistent pressure to state whether the government was "waiving" the issue, counsel for the government said yes in the heat of the moment.  Oral Arg. Recording 17:41-17:52.  But the next moment, when reminded of the difference between forfeiture and waiver—a distinction that lawyers often overlook or misunderstand, *cf. Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (even "jurists often use the words interchangeably")—counsel effectively retracted the foregoing statement, saying she was "not authorized to take a position" on whether J.D. has a constitutional right to an abortion, Oral Arg. Recording 17:52-18:51.

5

On October 22, 2017, J.D. filed a petition for rehearing en banc.  Today, the Court grants the petition, vacates the panel's October 20 order and denies the government's motion for stay pending appeal "substantially for the reasons set forth in" the panel dissent.

## II.  ANALYSIS

As I noted at the outset, the en banc Court's decision in effect means that a pregnant alien minor who attempts to enter the United States illegally is entitled to an abortion, assuming she complies with state abortion restrictions once she is here. Although the government has for some reason failed to dispute that proposition, it is not the law.

### A.  WE CAN AND MUST DECIDE THE ANTECEDENT QUESTION OF WHETHER J.D. HAS A CONSTITUTIONAL RIGHT TO AN ABORTION.

The Supreme Court has held that if a party "fail[s] to identify and brief" "an issue 'antecedent to . . . and ultimately dispositive of' the dispute," an appellate court may consider the issue *sua sponte*.  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)); *cf. United States v. Bowie*, 198 F.3d 905, 913 (D.C. Cir. 1999) ("We are never bound to accept the government's confession of error" (citing *Young v. United States*, 315 U.S. 257, 258 (1942), *United States v. Pryce*, 938 F.2d 1343, 1351-52 (D.C. Cir. 1991) (Randolph, J., concurring))).  Here, the question of whether J.D. has a constitutional right to an abortion is "antecedent to" any issue of undue burden.  And the antecedent question is "dispositive of" J.D.'s Fifth Amendment claim, at least now that my colleagues have reinstated the TRO on the apparent theory that the claim is likely meritorious.  Accordingly, we can and should expressly decide the antecedent question.

6

True, we should not ordinarily confront a broad constitutional question "if there is also present some other ground upon which the case may be disposed of," *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring), including if the alternative is a "narrower" constitutional ground, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 184 (1999).[4]  But in the analogous context of qualified immunity, we are "permitted . . . to avoid avoidance—that is, to determine whether a right exists before examining" the narrower question of whether the right "was clearly established" at the time an official acted.  *Camreta v. Greene*, 563 U.S. 692, 706 (2011).  Our discretion in that area rests on the recognition that it "is sometimes beneficial to clarify the legal standards governing public officials."  *Id.* at 707.  The same interest is, to put it mildly, implicated here.  Border authorities, immigration officials and HHS itself would be well served to know ex ante whether pregnant alien minors who come to the United States in search of an abortion are constitutionally entitled to one.  And under today's decision, pregnant alien minors the world around seeking elective abortions will be on notice that they should make the trip.[5]

---

[4]  We cannot duck a broad constitutional question if the alternative ground is not "an adequate basis for decision."  *Greater New Orleans Broad. Ass'n*, 527 U.S. at 184.  At the panel stage, the possibility of expeditious sponsorship was an adequate narrower basis for our decision to briefly *delay* J.D.'s abortion.  By contrast, today's result—which has the real-world effect of *entitling* J.D. to an abortion—is difficult to explain unless it rests at least in part on the proposition that J.D. has a constitutional right to an abortion.  Even if I were to assume, without in any way conceding, that J.D. had such a constitutional right, I would nonetheless stand by the panel order.

[5]  The panel dissent paid lip service to constitutional avoidance, Panel Dissent 8, before sweepingly declaring that when alien minors

7

Granted, because of the government's failure to take a position,[6] we in theory have discretion *not* to decide the antecedent question. But in reality the ship has sailed: as a result of my colleagues' decision, J.D. will soon be on her way to an abortion procedure she would not receive absent her invocation of the Fifth Amendment. If ever there were a case in which the public interest compels us to exercise our "independent power to identify and apply the proper construction of governing law" irrespective of a party's litigating position, *U.S. Nat'l Bank of Or.*, 508 U.S. at 446 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99

---

"find themselves on our shores and pregnant" and seeking an abortion, "the *Constitution* forbids the government from directly or effectively prohibiting their exercise of that *right* in the manner it has done here." Panel Dissent 9-10 (emphases added). That is not judicial modesty.

[6] I could not disagree more strongly with Judge Millett's characterization of the government's position on the merits—i.e., that it outright "waived" any contention that J.D. has no constitutional right to an abortion. Millett Concurrence 2-3 n.1. She must have read different papers and listened to a different argument from the ones I read and listened to. A waived argument "is one that a party has knowingly and intelligently relinquished." *Wood v. Milyard*, 132 S. Ct. 1826, 1832 n.4 (2012). The government has declared time and again that it is not taking a position on whether J.D. has a constitutional right to an abortion. That is not waiver. Government counsel in the district court stated that he was neither raising nor conceding the point. That is not waiver. Government counsel in this Court stated that she lacked authority to take a position. That, too, is not waiver: counsel who disclaims such authority cannot relinquish an argument any more than she can advance one. All this is beside the point, however, because of our independent duty to declare the law. *See U.S. Nat'l Bank of Or.*, 508 U.S. at 446.

8

(1991)), this is it. The stakes, both in the short run and the long, could scarcely be higher.

### B.  J.D. HAS NO CONSTITUTIONAL RIGHT TO AN ABORTION.

J.D. is not a U.S. citizen. She is not a permanent resident, legal or otherwise. According to the record, she has no connection to the United States, let alone "substantial" connections. Despite her physical presence in the United States, J.D. has never entered the United States as a matter of law and cannot avail herself of the constitutional rights afforded those legally within our borders. Accordingly, under a correct interpretation of the law, J.D. has virtually no likelihood of success on the merits and the TRO issued by the district court should remain stayed. *See Mazurek v. Armstrong*, 520 U.S. 968, 970 (1997) (preliminary injunctive relief unavailable if the plaintiff cannot establish a likelihood of success on the merits).

"The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Thus a young girl detained at Ellis Island for a year, and then released to live with her father in the United States for nearly a decade, "was to be regarded as stopped at the boundary line and kept there unless and until her right to enter should be declared." *Kaplan v. Tod*, 267 U.S. 228, 230 (1925). Even after she was no longer detained, "[s]he was still in theory of law at the boundary line and had gained no foothold in the United States." *Id.* Nearly six decades ago the Supreme Court had already said that "[f]or over a half century this Court has held that the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the

9

United States." *Leng May Ma v. Barber*, 357 U.S. 185, 188 (1958).

Aliens who have entered the United States—even if illegally—enjoy "additional rights and privileges not extended to those . . . who are merely 'on the threshold of initial entry.'" *Id*. at 187 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). "[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990). Until then—before developing the "substantial connections" that constitute "entry" for an illegally present alien—"[t]he Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Bridges v. Wixon*, 326 U.S. 135, 161 (1945) (Murphy, J., concurring).

We have repeatedly recognized this principle, as have our sister circuits and, most important, as has the Supreme Court. *See Kerry v. Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring in the judgment); *Demore v. Kim*, 538 U.S. 510, 546 (2003); *Shaughnessy*, 345 U.S. at 215; *Kaplan*, 267 U.S. at 230; *United States v. Ju Toy*, 198 U.S. 253, 263 (1905) (alien petitioner, "although physically within our boundaries, is to be regarded as if he had been stopped at the limit of our jurisdiction, and kept there while his right to enter was under debate"); *Kiyemba v. Obama*, 555 F.3d 1022, 1036-37 n.6 (D.C. Cir. 2009) (Rogers, J., concurring in the judgment) (quoting *Mezei*, *Leng May Ma* and *Ju Toy* in support of proposition that habeas court can order detainee brought within U.S. territory without thereby effecting detainee's "entry" for any other purpose), *vacated on other grounds*, 559 U.S. 131 (2010); *Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1383 (D.C. Cir. 1990) (Sentelle, J., concurring)

10

(summarizing the entry doctrine).[7]   Because she has never entered the United States, J.D. is not entitled to the due process protections of the Fifth Amendment.  *See Albathani v. INS*, 318 F.3d 365, 375 (1st Cir. 2003) ("As an unadmitted alien present in the United States, Albathani's due process rights are limited").  This is, or should be, clear from the controlling and

---

[7]  *See also Albathani v. INS*, 318 F.3d 365, 375 (1st Cir. 2003); *Nwozuzu v. Holder*, 726 F.3d 323, 330 n.6 (2d Cir. 2013) (discussing *Kaplan*); *United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954) ("in a literal and physical sense a person coming from abroad enters the United States whenever he reaches any land, water or air space within the territorial limits of this nation" but "those who have come from abroad directly to [an inspection] station seeking admission in regular course have not been viewed by the courts as accomplishing an 'entry' by crossing the national boundary in transit or even by arrival at a port so long as they are detained there pending formal disposition of their requests for admission"); *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012) ("the crime of illegal entry inherently carries this additional aspect that leaves an illegal alien's status substantially unprotected by the Constitution in many respects"); *Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (alien who entered the United States illegally at age seven and remained for the next 17 years was, under *Kaplan*, deportable and ineligible for derivative citizenship despite his father's intervening naturalization); *Vitale v. INS*, 463 F.2d 579, 582 (7th Cir. 1972) (paroled alien "did not effect an entry into the United States"); *Montgomery v. Ffrench*, 299 F.2d 730, 733 (8th Cir. 1962) (discussing *Kaplan*); *United States v. Argueta-Rosales*, 819 F.3d 1149, 1158 (9th Cir. 2016) ("for immigration purposes, 'entry' is a term of art requiring not only physical presence in the United States but also freedom from official restraint"); *United States v. Canals-Jimenez*, 943 F.2d 1284, 1286, 1288 (11th Cir. 1991) (reversing conviction of alien "found in" the United States illegally because alien never "entered" the United States in the sense of *Kaplan* and *Leng May Ma*).

11

persuasive authorities marshaled above, which are only a fraction of the whole.

Even if J.D. did enjoy the protections of the Due Process Clause, however, due process is not an "all or nothing" entitlement. In some cases "[i]nformal procedures will suffice," *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970); "consideration of what procedures due process may require" turns on "the precise nature of the government function" and the private interest. *Cafeteria Workers Union v. McElroy*, 367 U.S. 886, 895 (1961). What the Congress and the President have legitimately deemed appropriate for aliens "on the threshold" of our territory, the judiciary may not contravene. "It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter. . . .  As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, *are due process of law*." *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (emphasis added). There is a "class of cases" in which "the acts of executive officers, done under the authority of congress, [are] conclusive." *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. (18 How.) 272, 284 (1855). Among that class of cases are those brought by aliens abroad, including those who are "abroad" under the entry doctrine. *See Din*, 135 S. Ct. at 2139-40 (Kennedy, J., concurring in the judgment); *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972).

*Mandel* teaches that the Congress's "plenary power" over immigration requires the courts to strike a balance between private and public interests different from the due process that typically obtains. The Supreme Court "without exception has sustained" the Congress's power to exclude aliens, a power

12

"inherent in sovereignty," consistent with "ancient principles" of international law and "to be exercised exclusively by the political branches of government." *Mandel*, 408 U.S. at 765-66. Indeed, "over no conceivable subject is the legislative power of Congress more complete." *Id*. at 766 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)) (alteration omitted). The Congress's power to exclude includes the power "to prescribe the terms and conditions upon which [aliens] may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention." *Id*. (quoting *Lem Moon Sing v. United States*, 158 U.S. 538, 547 (1895)). Whatever the merits of different applications of due process "were we writing on a clean slate," "the slate is not clean." *Id*. (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)). We must therefore yield to the Executive, exercising the power lawfully delegated to him, when he "exercises this power negatively on the basis of a facially legitimate and bona fide reason." *Id*. at 770. Moreover, this deference is required even when the constitutional rights of U.S. citizens are affected: we may not "look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests" of *citizens* "who seek personal communication with" the excluded alien. *Id*. Thus in *Mandel*, the Executive permissibly prohibited an alien communist intellectual to travel to the United States, where he had been scheduled to speak at several universities.

Applying *Mandel*, the Supreme Court recently approved the Executive's denial of entry to an Afghan man whose U.S.-citizen wife was waiting for him in this country. *Din*, 135 S. Ct. at 2131 (plurality opinion). The Court in *Din* was divided not only over whether the wife had any due process interest in her husband's attempt to immigrate but also over whether that hypothetical interest had been infringed. *Compare id*.

13

(plurality opinion) (three justices concluding that there is no due process right "to live together with [one's] spouse in America"), *with id*. at 2139 (Kennedy, J., concurring in the judgment) (two justices concluding that, even if such a right exists, the Government's visa-denial notice is all that due process can require). Citing *Mandel*, Justice Kennedy reasoned that the government's action in *Din* was valid, even though it "burden[ed] a citizen's own constitutional rights," because it was made "on the basis of a facially legitimate and bona fide reason." *Id*. at 2139 (Kennedy, J., concurring in the judgment) (quoting *Mandel*, 408 U.S. at 770).[8] Justice Scalia, writing for himself, the Chief Justice and Justice Thomas, criticized the dissent's endorsement of the novel substantive due process right asserted by the plaintiff, which he characterized as, "in any world other than the artificial world of ever-expanding constitutional rights, nothing more than a deprivation of her spouse's freedom to immigrate into America." *Id*. at 2131 (plurality opinion).

*Mandel* applies with all the more force here, where a substantive due process right is asserted not by a U.S. citizen, nor by a lawful-permanent-resident alien, nor even by an *illegally* resident alien, but by an alien minor apprehended attempting to cross the border illegally and thereafter detained by the federal government.    If J.D. can be detained indefinitely—which she can be, *see Zadvydas*, 533 U.S. at 693 (distinguishing *Shaughnessy*, 345 U.S. 206)—and if she can be returned to her home country to prevent her from engaging in disfavored political speech in this country—which she can be, *Mandel*, 408 U.S. at 770—and if she can be paroled into the United States for a decade or more, *Kaplan*, 267 U.S. at 230,

---

    [8]  Justice Kennedy's opinion in *Din*, because it is narrower than the plurality opinion, is controlling.  *See Marks v. United States*, 430 U.S. 188, 193 (1977).

14

register for the draft, *Ng Lin Chong v. McGrath*, 202 F.2d 316, 317 (D.C. Cir. 1952), and see her parents naturalized, *Gonzalez v. Holder*, 771 F.3d 238, 239 (5th Cir. 2014), only for her *still* to be deported with cursory notice, 8 U.S.C. § 1225—then she cannot successfully assert a due process right to an elective abortion.

In concluding otherwise, the Court elevates the right to elective abortion above every other constitutional entitlement. Freedom of expression, *Mandel*, 408 U.S. at 770, freedom of association, *Galvan*, 347 U.S. at 523, freedom to keep and bear arms, *United States v. Carpio-Leon*, 701 F.3d 974, 975 (4th Cir. 2012), freedom from warrantless search, *Verdugo-Urquidez*, 494 U.S. at 274-75, and freedom from trial without jury, *Johnson v. Eisentrager*, 339 U.S. 763, 784-85 (1950) all must yield to the "plenary authority" of the Congress and the Executive, acting in concert, to regulate immigration; but the freedom to terminate one's pregnancy is more fundamental than them all? This is not the law.[9]

---

[9] The panel dissent simply assumed that the Supreme Court's abortion decisions involving U.S. citizen women—from *Roe v. Wade* to *Whole Woman's Health*—apply *mutatis mutandis* to illegal alien minors. There is no legal analysis to support this assumption, *see generally* Panel Dissent 3-6, which is untenable for the reasons I have described. Judge Millett's subsequent opinion concurring in the Court's en banc disposition does nothing to address that deficit, offering scarce authority to support its assertion of the thwarting of a "grave constitutional wrong" by the government and none that addresses the antecedent constitutional question, which the Court must decide but which Judge Millett dismisses as waived. Millett Concurrence 2-3 n.1.

15

The panel dissent warned of outlandish scenarios that will follow from staying the TRO,[10] Panel Dissent 9, but a stay maintains the legal status quo.  The United States remains a signatory to the U.N. Convention Against Torture; our law imposes civil liability on government agents who commit torts and criminal liability on those who commit crimes; and counsel have access to detained alien minors, as have J.D.'s counsel.

---

I cannot improve on the Chief Justice's criticism of the "false premise" that

> our practice of avoiding unnecessary (and unnecessarily broad) constitutional holdings somehow trumps our obligation faithfully to interpret the law.  It should go without saying, however, that we cannot embrace a narrow ground of decision simply because it is narrow; it must also be right.  Thus while it is true that "[i]f it is not necessary to decide more, it is necessary not to decide more," sometimes it *is* necessary to decide more.  There is a difference between judicial restraint and judicial abdication.  When constitutional questions are "indispensably necessary" to resolving the case at hand, "the court must meet and decide them."

*Citizens United v. FEC*, 558 U.S. 310, 375 (2010) (Roberts, C.J., concurring) (quoting *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C.J.)).

[10]  My colleague's characterization of this case, *see, e.g.*, Millett Concurrence 13, gives it an undeservedly melodramatic flavor—and indeed, from the record, especially the sealed affidavit of ORR's Jonathan White, is contrary to fact.  Sealed Supp. to Defs.' Resp. to Pl.'s Pet. for Reh'g En Banc (Oct. 23, 2017).  J.D. may be sympathetic.  But even the sympathetic are bound by longstanding law.

16

The Constitution does not, and need not, answer every question but diabetics, rape victims and women whose pregnancies threaten their lives are nevertheless provided for. *Contra* Panel Dissent 9.

Although the panel dissent found "deeply troubling" the argument "that J.D. is not a person in the eyes of our Constitution," the argument is nevertheless correct.[11]   The panel dissent's contrary conclusion is based on a misunderstanding of the Supreme Court's immigration due process decisions, including a mistaken reliance on the dissent in *Jean v. Nelson*, 472 U.S. 846, 875 (1985) (Marshall, J., dissenting).   Writing for the Court in *Jean*, then-Justice Rehnquist expressly declined to opine on the alien plaintiffs' due process rights, *see id.* at 857 (majority opinion), much less to hold—as Justice Marshall would have done—that "regardless of immigration status, aliens within the territorial jurisdiction of the United States are 'persons' entitled to due process under the Constitution."   The Supreme Court has never so held.[12]   *Contra* Panel Dissent 9.

---

[11]   J.D.'s "personhood" has nothing to do with it.   "American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans."   *Eisentrager*, 339 U.S. at 783. No one suggests that members of the military—or here, J.D.—are thereby not "persons."

[12]   The panel dissent's handling of *Zadvydas v. Davis* also merits clarification.   *See* Panel Dissent 9.   *Zadvydas* is careful to distinguish "an alien who has *effected an entry* into the United States and one who has never entered" and restates *Kaplan*'s holding that "despite nine years' presence in the United States, an 'excluded' alien 'was still in theory of law at the boundary line and had gained no foothold in the United States'" only three sentences before observing, in the

17

It is the panel dissent's (and now the Court's) position that will unsettle the law, potentially to dangerous effect. Having discarded centuries of precedent and policy, the majority offers no limiting principle to constrain this Court or any other from following today's decision to its logical end. If the Due Process Clause applies to J.D. with full force, there will be no reason she cannot donate to political campaigns, despite 52 U.S.C. § 30121's prohibition on contributions by nonresident foreign nationals inasmuch as freedom of political expression is plainly fundamental to our system of ordered liberty. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010). I see no reason that she may not possess a firearm, notwithstanding 18 U.S.C. § 922(g)(5)'s prohibition on doing so while "illegally or unlawfully in the United States," *see Carpio-Leon*, 701 F.3d at 975, inasmuch as "the Second Amendment conferred an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), in recognition of the "basic right" of self-defense, *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Even the government's ability to try accused war criminals before U.S. military commissions in theater must be reconsidered as it is premised on the Fifth Amendment's territoriality requirement, which today, by vacating the stay, the Court has so summarily eroded. *See Eisentrager*, 339 U.S. at 784-85.

Heedless of the entry doctrine, its extensive pedigree in our own precedent and its controlling effect in this case, the Court today assumes away the question of what (if any) process is due J.D. and proceeds to a maximalist application of some of the most controverted case law in American jurisprudence. It does so over the well-founded objections of an Executive

---

passage quoted by the panel dissent, that "once an alien *enters* the country, the legal circumstance changes." *Zadvydas*, 533 U.S. at 693 (emphasis added). *Zadvydas* uses "entry" in its technical sense.

18

authorized to pursue its legitimate interest in protecting fetal life.  *See Gonzales v. Carhart*, 550 U.S. 124, 145 (2007) ("the government has a legitimate and substantial interest in preserving and promoting fetal life"); *Casey*, 505 U.S. at 853 (recognizing States' "legitimate interests in protecting prenatal life"); *Roe v. Wade*, 410 U.S. 113, 150 (1973) (recognizing "the State's interest—some phrase it in terms of duty—in protecting prenatal life").  Far from faithfully applying the Supreme Court's abortion cases, this result contradicts them, along with a host of immigration and due-process cases the Court declines even to acknowledge.  *Garza v. Hargan* today takes its place in the pantheon of abortion-exceptionalism cases.

Accordingly, I respectfully dissent.

KAVANAUGH, *Circuit Judge*, with whom *Circuit Judges* HENDERSON and GRIFFITH join, dissenting:

The en banc majority has badly erred in this case.

The three-judge panel held that the U.S. Government, when holding a pregnant unlawful immigrant minor in custody, may seek to expeditiously transfer the minor to an immigration sponsor before the minor makes the decision to obtain an abortion. That ruling followed from the Supreme Court's many precedents holding that the Government has permissible interests in favoring fetal life, protecting the best interests of a minor, and refraining from facilitating abortion. The Supreme Court has repeatedly held that the Government may further those interests so long as it does not impose an undue burden on a woman seeking an abortion.

Today's majority decision, by contrast, "substantially" adopts the panel dissent and is ultimately based on a constitutional principle as novel as it is wrong: a new right for unlawful immigrant minors in U.S. Government detention to obtain immediate abortion on demand, thereby barring any Government efforts to expeditiously transfer the minors to their immigration sponsors before they make that momentous life decision. The majority's decision represents a radical extension of the Supreme Court's abortion jurisprudence. It is in line with dissents over the years by Justices Brennan, Marshall, and Blackmun, not with the many majority opinions of the Supreme Court that have repeatedly upheld reasonable regulations that do not impose an undue burden on the abortion right recognized by the Supreme Court in *Roe v. Wade*.[1]

---

[1]    The majority's decision rules against the Government "substantially for the reasons set forth in" the panel dissent. Given this ambiguity, the precedential value of this order for future cases will be debated. But for present purposes, we have no choice but to

2

   To review: Jane Doe is 17 years old.  She is a foreign
citizen.  Last month, she was detained shortly after she illegally
crossed the border into Texas.  She is now in a U.S.
Government detention facility in Texas for unlawful immigrant
minors.  She is 15-weeks pregnant and wants to have an
abortion.  Her home country does not allow elective abortions.

   All parties to this case recognize *Roe v. Wade* and *Planned
Parenthood v. Casey* as precedents we must follow.  All parties
have assumed for purposes of this case, moreover, that Jane
Doe has a right under Supreme Court precedent to obtain an
abortion in the United States.  One question before the en banc
Court at this point is whether the U.S. Government may
expeditiously transfer Jane Doe to an immigration sponsor
before she makes the decision to have an abortion.  Is that an
undue burden on the abortion right, or not?

   Contrary to a statement in the petition for rehearing en
banc, the three-judge panel's order did not avoid that question.
The panel confronted and resolved that question.

   *First*, the Government has assumed, presumably based on
its reading of Supreme Court precedent, that an unlawful
immigrant minor such as Jane Doe who is in Government
custody has a right to an abortion.  The Government has also
expressly assumed, again presumably based on its reading of
Supreme Court precedent, that the Government lacks authority
to block Jane Doe from obtaining an abortion.  For purposes of

---

assume that the majority agrees with and adopts the main reasoning
for the panel dissent.  Otherwise, the majority would have no
explanation for the extraordinary step it is taking today.  For
accuracy, I therefore use the word "majority" when describing the
main points of the panel dissent.  (If any members of the majority
disagreed with any of the main points of the panel dissent, they were
of course free to say as much.)

3

this case, all parties have assumed, in other words, that unlawful immigrant minors such as Jane Doe have a right under Supreme Court precedent to obtain an abortion in the United States.

*Second*, under Supreme Court precedent in analogous contexts, it is not an undue burden for the U.S. Government to transfer an unlawful immigrant minor to an immigration sponsor before she has an abortion, so long as the transfer is expeditious.

For minors such as Jane Doe who are in U.S. Government custody, the Government has stated that it will not provide, pay for, or otherwise facilitate the abortion but will transfer custody of the minor to a sponsor pursuant to the regular immigration sponsor program. Under the regular immigration sponsor program, an unlawful immigrant minor leaves Government custody and ordinarily goes to live with or near a sponsor. The sponsor often is a family member, relative, friend, or acquaintance. Once Jane Doe is transferred to a sponsor in this case, the Government accepts that Jane Doe, in consultation with her sponsor if she so chooses, will be able to decide to carry to term or to have an abortion.[2]

The panel order had to make a decision about how "expeditious" the transfer had to be. Given the emergency posture in which this case has arisen, the panel order prudently did not purport to define "expeditious" for all future cases. But the panel order set a date of October 31 – which is 7 days from now – by which the transfer had to occur. For future cases, the term "expeditious" presumably would entail some combination of (i) expeditious from the time the Government learns of the

_____

[2]  The minor of course also has to satisfy whatever state-law requirements are imposed on the decision to obtain an abortion.

4

pregnant minor's desire to have an abortion and (ii) expeditious in the sense that the transfer to the sponsor does not occur too late in the pregnancy for a safe abortion to occur.[3]  In this case, although the process by which the case has arrived here has been marked by understandable confusion over the law and by litigation filed by plaintiff in multiple forums, the panel order concluded that a transfer by October 31 – which is 7 days from now – was permissibly expeditious.  This would entail transfer in week 16 or 17 of Jane Doe's pregnancy, and the Government agrees that she could have the abortion immediately after transfer, if she wishes.

*Third*, what happens, however, if a sponsor is not found by October 31 in this case?  What happens generally if transfer to a sponsor does not occur expeditiously?  To begin with, a declaration we just received from the Government states: "while difficult, it is possible to complete a sponsorship process for J.D. by 5 P.M. Eastern on October 31, 2017."  The declaration also lists several ongoing efforts regarding the sponsorship process.  The declaration adds that all components of the U.S. Government "are willing to assist in helping expedite the process."

But if transfer does not work, given existing Supreme Court precedent and the position the Government has so far advanced in this litigation, it could turn out that the Government will be required by existing Supreme Court precedent to allow the abortion, even though the minor at that point would still be residing in a U.S. Government detention facility.  If so, the Government would be in a similar position as it is in with adult women prisoners in federal prison and with

---

[3]  To be clear, under Supreme Court precedent, the Government cannot use the transfer process as some kind of ruse to unreasonably delay the abortion past the point where a safe abortion could occur.

5

adult women unlawful immigrants in U.S. Government custody. The U.S. Government allows women in those circumstances to obtain an abortion. In any event, we can immediately consider any additional arguments from the Government if and when transfer to a sponsor is unsuccessful.

*In sum*, under the Government's arguments in this case and the Supreme Court's precedents, the unlawful immigrant minor is assumed to have a right under precedent to an abortion; the Government may seek to expeditiously transfer the minor to a sponsor before the abortion occurs; and if no sponsor is expeditiously located, then it could turn out that the Government will be required by existing Supreme Court precedent to allow the abortion, depending on what arguments the Government can make at that point. These rules resulting from the panel order are consistent with and dictated by Supreme Court precedent.

The three-judge panel reached a careful decision that prudently accommodated the competing interests of the parties.

By contrast, under the panel dissent, which is "substantially" adopted by the majority today, the Government has to *immediately* allow the abortion upon the request of an unlawful immigrant minor in its custody, and cannot take time to first seek to expeditiously transfer the minor to an immigrant sponsor before the abortion occurs.[4]

---

[4]  The majority's order denies the Government's emergency motion for stay pending appeal and thus does not disturb the District Judge's injunction (with adjusted dates), which required the Government to facilitate an immediate abortion for Jane Doe. Therefore, unless the Government can somehow convince the District Judge to suddenly reconsider her decision, which is extremely unlikely given the District Judge's prior ruling on this matter, the majority's order today necessarily means that the

6

The majority seems to think that the United States has no
good reason to want to transfer an unlawful immigrant minor
to an immigration sponsor before the minor has an abortion.
But consider the circumstances here.  The minor is alone and
without family or friends.  She is in a U.S. Government
detention facility in a country that, for her, is foreign.  She is
17 years old.  She is pregnant and has to make a major life
decision.  Is it really absurd for the United States to think that
the minor should be transferred to her immigration sponsor –
ordinarily a family member, relative, or friend – before she
makes that decision?  And keep in mind that the Government
is not forcing the minor to talk to the sponsor about the
decision, or to obtain consent.  It is merely seeking to place the
minor in a better place when deciding whether to have an
abortion.  I suppose people can debate as a matter of policy
whether this is always a good idea.  But unconstitutional?  That
is far-fetched.  After all, the Supreme Court has repeatedly said
that the Government has permissible interests in favoring fetal
life, protecting the best interests of the minor, and not
facilitating abortion, so long as the Government does not
impose an undue burden on the abortion decision.

It is important to stress, moreover, that this case involves
a minor.  We are not dealing with adults, although the
majority's rhetoric speaks as if Jane Doe were an adult.  The
law does not always treat minors in the same way as adults, as
the Supreme Court has repeatedly emphasized in the abortion
context.

The majority points out that, in States such as Texas, the
minor will have received a judicial bypass.  That is true, but is
irrelevant to the current situation.  The judicial bypass confirms

---

Government must allow an immediate abortion while Jane Doe
remains in Government custody.

7

that the minor is capable of making a decision. For most teenagers under 18, of course, they are living in the State in question and have a support network of friends and family to rely on, if they choose, to support them through the decision and its aftermath, even if the minor does not want to inform her parents or her parents do not consent. For a foreign minor in custody, there is no such support network. It surely seems reasonable for the United States to think that transfer to a sponsor would be better than forcing the minor to make the decision in an isolated detention camp with no support network available. Again, that may be debatable as a matter of policy. But unconstitutional? I do not think so.

The majority apparently thinks that the Government must allow unlawful immigrant minors to have an immediate abortion on demand. Under this vision of the Constitution, the Government may not seek to first expeditiously transfer the minor to the custody of an immigration sponsor before she has an abortion.[5] The majority's approach is radically inconsistent with 40 years of Supreme Court precedent. The Supreme Court has repeatedly upheld a wide variety of abortion regulations that entail some delay in the abortion but that serve permissible Government purposes. These include parental consent laws, parental notice laws, informed consent laws, and waiting periods, among other regulations. Those laws, of course, may have the effect of delaying an abortion. Indeed, parental consent laws in practice can occasion real-world delays of several weeks for the minor to decide whether to seek her

---

[5] The precedential value of the majority's decision for future cases is unclear and no doubt will be the subject of debate. But one limit appears clear and warrants mention: The majority's decision requires the Government to allow the abortion even while the minor is residing in Government custody, but it does not require the Government to pay for the abortion procedure itself. The Government's policy on that issue remains undisturbed.

8

parents' consent and then either to obtain that consent or
instead to seek a judicial bypass. Still, the Supreme Court has
upheld those laws, over vociferous dissents. *See, e.g.*, *Ohio v.
Akron Center for Reproductive Health*, 497 U.S. 502, 532
(1990) (Blackmun, J., joined by Brennan and Marshall, JJ.,
dissenting) ("Ohio's judicial-bypass procedure can consume
up to three weeks of a young woman's pregnancy.") (citation
omitted); *Hodgson v. Minnesota*, 497 U.S. 417, 465 (1990)
(Marshall, J., joined by Brennan and Blackmun, JJ., dissenting)
("[T]he prospect of having to notify a parent causes many
young women to delay their abortions . . . ."); *H.L. v. Matheson*,
450 U.S. 398, 439 (1981) (Marshall, J., joined by Brennan and
Blackmun, JJ., dissenting) ("[T]he threat of parental notice
may cause some minor women to delay past the first trimester
of pregnancy . . . .").

　　To be sure, this case presents a new situation not yet
directly confronted by the Supreme Court. But that happens all
the time. When it does, our job as lower court judges is to apply
the precedents and principles articulated in Supreme Court
decisions to the new situations. Here, as I see it and the panel
saw it, the situation of a pregnant unlawful immigrant minor in
a U.S. Government detention facility is a situation where the
Government may reasonably seek to expeditiously transfer the
minor to a sponsor before she has an abortion.

　　It is undoubtedly the case that many Americans –
including many Justices and judges – disagree with one or
another aspect of the Supreme Court's abortion jurisprudence.
From one perspective, some disagree with cases that allow the
Government to refuse to fund abortions and that allow the
Government to impose regulations such as parental consent,
informed consent, and waiting periods. That was certainly the
position of Justices Brennan, Marshall, and Blackmun in many
cases. From the other perspective, some disagree with cases

9

holding that the U.S. Constitution provides a right to an abortion.

As a lower court, our job is to follow the law as it is, not as we might wish it to be. The three-judge panel here did that to the best of its ability, holding true to the balance struck by the Supreme Court. The en banc majority, by contrast, reflects a philosophy that unlawful immigrant minors have a right to immediate abortion on demand, not to be interfered with even by Government efforts to help minors navigate what is undeniably a difficult situation by expeditiously transferring them to their sponsors. The majority's decision is inconsistent with the precedents and principles of the Supreme Court – for example, the many cases upholding parental consent laws – allowing the Government to impose reasonable regulations so long as they do not unduly burden the right to abortion that the Court has recognized.

This is a novel and highly fraught case. The case came to us in an emergency posture. The panel reached a careful decision in a day's time that, in my view, was correct as a legal matter and sound as a prudential matter. I regret the en banc Court's decision and many aspects of how the en banc Court has handled this case.[6]

_____

[6] The Court never should have reheard this case en banc in the first place. As the Supreme Court has instructed, "En banc courts are the exception, not the rule. They are convened only when extraordinary circumstances exist that call for authoritative consideration and decision by those charged with the administration and development of the law of the circuit." *United States v. American-Foreign Steamship Corp.*, 363 U.S. 685, 689 (1960). Federal Rule 35 provides that rehearing en banc is reserved for cases that involve "a question of exceptional importance." This Court's judges have adhered to that principle, even while entertaining doubts about a panel's application of the law to individual litigants. Here,

10

I respectfully dissent.

_____

on the law, the three-judge panel's order was unpublished; therefore, it constituted no legal precedent for future cases.  As to the facts of this one case, if the panel's order had blocked Jane Doe from obtaining an abortion, the en banc consideration might be different. If the panel's order had forced Jane Doe to the cusp of Texas's 20-week abortion cutoff, the en banc consideration might be different. If the panel's order had significantly delayed Jane Doe's decision, the en banc consideration might be different.

But the panel's order did none of those things.  The panel was faced with an emergency motion involving an under-developed factual record that is still unclear and hotly contested.  Indeed, the parties have submitted new evidence by the hour over the past two days – none of which was presented to the panel.  The panel's unpublished order recognized Jane Doe's interests without prematurely requiring the Government to act against its interests. The panel decision was prudent and reasonable, given all of the circumstances.  Indeed, as noted above, the Government represents that, while difficult, it is possible for Jane Doe to obtain a sponsor by "5:00 P.M. Eastern on October 31, 2017."  This case, as handled by the three-judge panel, therefore was on a path to a prompt resolution that would respect the interests of all parties – until the en banc Court unwisely intervened.  This case did not meet the standard for rehearing en banc.